UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re A123 Systems, Inc. Securities Litigation

No.  1:12-cv-10591-RGS

<u>CLASS ACTION</u>

**CONSOLIDATED AMENDED COMPLAINT**

**JURY TRIAL DEMAND**

THIS DOCUMENT RELATES TO:

All Consolidated Actions

Lead Plaintiff Suk Cheung ("Lead Plaintiff") and Plaintiffs Scott Heiss and Michael Zoitas (collectively, "Plaintiffs"), on their own behalf and on behalf of others similarly situated, by their attorneys, hereby allege the following based upon information and belief, and upon the investigation by Plaintiffs' Counsel, which included among other things, a review of the facts and circumstances alleged herein, including, without limitation: (a) review and analysis of certain filings made by A123 Systems, Inc. ("A123 Systems," "A123," or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of certain press releases, public statements, news articles, and other publications disseminated by or concerning Defendants herein (as defined below) and related parties; (c) review and analysis of certain A123 Systems press conferences, analyst conference calls, and the corporate website of A123 Systems; (d) review and analysis of securities analyst reports concerning A123 Systems and its operations; (e) interviews with various former employees of A123 Systems and other individuals; (f) review and analysis of information concerning A123 Systems and its products readily available on the Internet; and (g) review and analysis of certain other information, documents, and materials concerning

A123 Systems and the other Defendants named herein.  Plaintiffs believe that further

substantial evidentiary support exists for the allegations in this consolidated amended

complaint (the "Complaint") and will be available after a reasonable opportunity for

discovery.  Many of the facts supporting the allegations contained herein are known only to

Defendants or are exclusively within their custody and/or control.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a securities fraud class action against A123 Systems and certain of its

officers and directors (the "Defendants").  Plaintiffs bring this class action on behalf of all

persons and entities that purchased or otherwise acquired common stock issued by A123

Systems (the "Class") between February 28, 2011 through and including March 26, 2012 (the

"Class Period").  Defendants defrauded Plaintiffs and the other members of the Class by

making fraudulent material misrepresentations and omissions regarding A123's then-current

financial condition and future prospects to Plaintiffs, the Company's shareholders, and the

investing public.

2.      A123 Systems designs, develops, manufactures, and sells advanced,

rechargeable lithium-ion batteries and battery systems, including "next-generation prismatic

batteries" (the "Prismatic Battery" or "Prismatic Batteries").  A123's largest customer was

Fisker Automotive, which during the Class Period utilized A123 as a supplier for its flagship

vehicle, the Fisker Karma.  Indeed, during the Class Period, orders of the Company's

batteries for the Karma were reported to account for approximately 25% of A123's revenues.

3.      So critical was the Fisker account to the Company that it committed to be

Fisker's **sole** supplier with full knowledge (or at least reckless disregard of material facts

such that it should have known) that it would not meet Fisker's aggressive production

demands without seriously compromising safety and quality control.  Demonstrative of

A123's flagrant disregard for safety and quality is the fact that its competitors (EnerDel and Advanced Lithium Power, Inc.) rejected Fisker's lucrative contract because Fisker's timeline and required volume of 1,000 prismatic cells per day were simply too unrealistic to fulfill without compromising safety and quality control standards.  But A123 ignored those concerns, committing itself to meet Fisker's numbers, which quickly swelled to an alarming 11,000 cells per day.

4.      Defendants agreed to Fisker's wholly unrealistic contract proposal because of A123's dire financial condition.  Indeed, for the fiscal year ending 2010, A123 had suffered a staggering loss of $153 million, and had suffered three consecutive years of negative cash flow.  Securing the Fisker contract was critical to A123's future viability.

5.      The Company trumpeted its arrangement with Fisker to investors, announcing in January 2010 that its "multi-year agreement provides that A123 is the selected battery system supplier for the Fisker Karma" and that "A123 plans to manufacture the cells and systems at its Livonia, Mich. facility with production slated to commence later this year." Moreover, A123  misleadingly assured investors that it was able to meet Fisker's schedule: "Fisker Automotive selected A123 because of the company's ability to meet our performance needs and rapidly scale to our production volume."

6.      Once the contract was secured, the Company embarked on a reckless gambit to meet Fisker's production demands despite the Company's utter lack of wherewithal to do so.  Indeed, the Company's Livonia facility, which was responsible for producing the Prismatic Batteries for Fisker, was not even prepared for its initial start date of June 22, 2010, because the equipment for the facility had yet to arrive.  Once production did commence the

facility was in such disarray that the prospect of widespread manufacturing errors was a near certainty.

7.       Emblematic of the haphazard manufacturing process at Livonia, working instructions to employees were written in Korean because that is where A123's prior manufacturing operations were conducted.  In order to understand these instructions, employees utilized the free service of "Google Translate" -- hardly reflective of the state-of-the-art facility touted by the Company.  Indeed, countless Confidential Witnesses ("CWs") confirmed that the manufacturing process at Livonia was rife with fundamental flaws, which ultimately, and inevitably, led to defects in the Prismatic Batteries produced by A123.

8.       Such flaws -- which were known to A123's management but were concealed from investors -- included: 1) a defective welding process that resulted in part from defective welding tabs; 2) improperly coated electrode plates that were inserted into the prismatic cells, causing additional damage at later points in the production process; 3) widespread contamination of the Prismatic Battery parts due to egregious violations of quality control protocols caused by employees removing parts and examining them by hand;  and 4) improper inclusion of parts classified as defective by the quality control team in the Prismatic Batteries.

9.       As a result of the defects in A123's Prismatic Batteries caused by its numerous manufacturing flaws, on November 4, 2011, the Company abruptly announced that it was revising its revenue guidance downward by 22% due to "an unexpected reduction in orders for battery packs from Fisker."  The Company, however, failed to alert investors that this "unexpected reduction" of orders represented an estimated 3,000 units, which was essentially A123's entire battery production for Fisker for the fourth quarter of 2011.  On this

news, the Company's shares plummeted from $3.53 to $3.17, or 10%, on unusually heavy trading volume of 3.4 million shares.

10.     Seeking to avoid a wider selloff, A123 downplayed Fisker's order halt, reassuring investors that the Fisker "reduction" only reflected a "temporary" inventory reduction, and that its relationship with Fisker remained "strong."  However, A123 concealed from investors that the halt was a result of substantial defects in the Company's batteries, which would ultimately lead to a massive recall of *all* of its Prismatic Batteries.

11.     Belying the Company's statements regarding the nature of Fisker's sudden "reduction" in orders, on December 21, 2011, the National Highway Traffic Safety Administration ("NHTSA") announced that, due to manufacturing defects in the batteries produced by A123, Fisker was recalling all of its Karma vehicles produced between July 1 – November 3, 2011 (the day immediately preceding A123's announcement of sharply reduced sales from Fisker).  In an attempt at damage control, two days later, the Company assured investors that only fifty customer cars were impacted, and that A123 "***expecte[d] this situation to have a minimal financial impact on A123.***"  A123's estimate that only 50 customer cars were impacted was a blatant misrepresentation, as the NHSTA had already reported that 239 cars were likely impacted by A123's manufacturing defects.

12.     On March 26, 2012, additional flaws at the Livonia facility were revealed to investors.  That day, the Company belatedly admitted that, despite its prior representations that the recall would have only a "minimal" impact on the Company, "***virtually all of the product we produced in [the Livonia facility] has been effectively contaminated***" with manufacturing defects.  Moreover, the Company estimated that it would cost a staggering $55 million to replace the contaminated Prismatic Batteries.  This figure represented

approximately one-quarter of the Company's anticipated annual revenues for 2012.   In

response to these chilling disclosures, the Company's share price fell dramatically -- from

$1.70 to $1.49, more than 12%, at the close of trading on March 26, 2012.

13.     Two days after this announcement, on March 28, 2012, Deutsche Bank

analyst Dan Galves opined that the Company would be unable to raise capital as a result of

the steep cost of replacing the defective batteries, and that A123 Systems would likely lose

contracts due to the embarrassing recall.   On this news, the Company's share price fell

another 13% to close at $1.22 on March 28, 2012.

14.     Throughout the Class Period, Defendants made false and misleading

statements and/or failed to disclose material adverse facts about the Company's

manufacturing process and the Prismatic Battery.   Specifically, Defendants misrepresented

and/or failed to adequately disclose that: (1) the Company's manufacturing process at the

Livonia, Michigan facility was fundamentally flawed resulting in the production of defective

Prismatic Batteries;  (2)  Livonia's lack of capacity to meet Fisker's production schedule

virtually guaranteed that the Prismatic Batteries would be defective; and (3) as a result of the

defective Prismatic Batteries, A123 Systems would almost certainly be required to recall

and/or replace the affected products, incurring substantial costs, and threatening the financial

viability of the Company.   As a result of the foregoing, the Company's statements were

materially false and misleading at all relevant times.   Defendants knew, or were reckless in

not knowing, that the statements were false and misleading, or Defendants otherwise

recklessly disregarded the accuracy of the statements.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to

Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa.

16.     This Court has jurisdiction over the subject matter of this action pursuant to

28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

17.     The Court has personal jurisdiction over Defendants.  In connection with the

acts and omissions alleged in this Complaint, Defendants, directly and/or indirectly, used the

means and instrumentalities of interstate commerce, including, without limitation, interstate

telephone communications, the mails and wires, and the facilities of the national securities

exchanges.

18.     Venue is proper in this Judicial District pursuant to Section 27 of the

Exchange Act, 15 U.S.C. § 78aa.  Many of the acts and transactions constituting the

violations of law complained of herein, including the dissemination to the public of

materially false and misleading statements, occurred in this District.  In addition, A123

Systems maintains its principal executive offices in this Judicial District and all other

Defendants are top executive officers of A123 Systems.  Defendant Vieau and Defendant

Granara both reside in this Judicial District.  Lead Plaintiff Cheung also resides in this

Judicial District.

## THE PARTIES

19.     By Order of the Court dated June 7, 2012, Suk Cheung was appointed Lead

Plaintiff.  Lead Plaintiff purchased A123's common stock during the Class Period and

sustained significant losses as a direct result of Defendants' misleading and deceptive

conduct alleged herein.  Lead Plaintiff Cheung purchased shares in A123 common stock as

follows:

- 12,000 A123 shares on March 1, 2011;

- 10,000 A123 shares on March 31, 2011;

- 24,000 A123 shares on April 8, 2011;

- 4,000 A123 shares on June 8, 2011;

- 2,000 A123 shares on August 8, 2011;

- 4,000 A123 shares on October 4, 2011;

- 30,000 A123 shares on November 14, 2011; and

- 40,000 A123 shares on November 15, 2011.

The executed Certification of Lead Plaintiff, previously filed with her motion to be appointed lead plaintiff authorizing her participation in this action, is attached hereto as mandated by the Private Securities Litigation Reform Act of 1995 ("PSLRA") in Section 21D(a)(2)(A) of the Exchange Act.

20.     On April 2, 2012, Plaintiff Scott Heiss ("Heiss") filed the first complaint in this consolidated action.  Heiss purchased A123's common stock during the Class Period and sustained significant losses as a direct result of Defendants' misleading and deceptive conduct alleged herein.  Plaintiff Heiss purchased shares in A123 common stock as follows:

- 1,475 A123 shares on May 13, 2011;

- 1,640 A123 shares on June 16, 2011;

- 8,400 A123 shares on January 26, 2012;

- 2,976 A123 shares on February 16, 2012;

- 7,500 A123 shares on February 17, 2012;

- 3,650 A123 shares on February 24, 2012; and

- 14,200 A123 shares on February 29, 2012.

Heiss's executed Certification, which was previously filed with his complaint, is attached hereto as mandated by the PSLRA in Section 21D(a)(2)(A) of the Exchange Act.

21.     On June 1, 2012, Plaintiff Michael Zoitas ("Zoitas") filed a Motion for Appointment as Lead Plaintiff in this Action.  Zoitas purchased A123's common stock during the Class Period and sustained significant losses as a direct result of Defendants' misleading and deceptive conduct alleged herein.  Plaintiff Zoitas purchased shares in A123 common stock as follows:

- 6,000 A123 shares on June 8, 2011;

- 5,000 A123 shares on September 16, 2011;

- 24,000 A123 shares on November 21, 2011;

- 20,000 A123 shares on December 16, 2011;

- 69,000 A123 shares on February 9, 2012; and

- 1,000 A123 shares on March 5, 2012.

Zoitas's executed Certification, which was previously filed with his motion to be appointed lead plaintiff authorizing his participation in this action, is attached hereto as mandated by the PSLRA in Section 21D(a)(2) of the Exchange Act.

22.     Defendant A123 Systems is a Delaware corporation with its principal place of business at 200 West Street, Waltham, Massachusetts.  The Company's common stock trades on the NASDAQ Global Market ("NASDAQ") under the symbol "AONE."  As of June 2012, the Company had approximately 146,860,000 shares outstanding.

23.     Defendant David P. Vieau ("Vieau") has been the Company's Chief Executive Officer ("CEO"), President, and a director on the Board of Directors ("Board") since March 2002.  According to the Company's Definitive Proxy Statement filed with the SEC on April 13, 2012, in 2011 Defendant Vieau received a salary of $431,250 and a bonus of $225,000.  According to that same Proxy Statement, Defendant Vieau also received stock

awards with a value of $488,452 and option awards with a value of $222,432. Defendant

Vieau's total compensation for 2011 was therefore $1,367,134. As such, the amount of

salary and non-equity incentive plan compensation Defendant Vieau earned in 2011 was less

than half of his total compensation. Defendant Vieau also sold 77,777 shares of A123's

common stock for $464,931 during the Class Period, amounting to 34% of his 2011 total

compensation.

      24.     Defendant David J. Prystash ("Prystash") has been the Company's Chief

Financial Officer ("CFO") since May 12, 2011. According to the Company's Definitive

Proxy Statement filed with the SEC on April 13, 2012, in 2011 Defendant Prystash received

a salary of $221,442, a sign-on bonus of $25,000, and a cash incentive bonus of $122,500.

According to that same Proxy Statement, Defendant Prystash also received stock awards with

a value of $400,952 and option awards with a value of $1,324,610. Accordingly, Defendant

Prystash's total compensation for 2011 was $2,094,505. As such, the amount of salary and

non-equity incentive plan compensation Defendant Prystash earned in 2011 in proportion to

his total compensation reported was only 16.4%; the balance was in stock and option awards.

      25.     Defendant John R. Granara III ("Granara") served as the Company's Interim

Chief Financial Officer between January 2011 and May 11, 2011, and had served as the Vice

President of Finance and Corporate Controller from January 2010 until May 11, 2011.

According to the Company's Definitive Proxy Statement filed with the SEC on April 13,

2012, Defendant Granara received a salary of $89,605 and a bonus of $50,000, a total of

$139,606, for acting as interim CFO between January 1, 2011 and May 11, 2011.

      26.     Defendants Vieau, Prystash, and Granara are collectively referred to herein as

the "Individual Defendants."

27.     Defendant A123 Systems and the Individual Defendants are collectively referred to herein as the "Defendants."

28.     During the Class Period, each of the Individual Defendants, as senior executive officers and/or a director of A123 Systems, was privy to non-public information concerning its products, business, finances, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and Board of Directors ("Board") meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse effects specified herein had not been disclosed to, and were being concealed from, the investing public.

29.     Each of the Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports, and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained within and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with A123 Systems, each of the Individual Defendants had access to the adverse undisclosed information about the shoddy manufacturing of the Prismatic Batteries and A123's product performance generally, and its operations, financial condition, and contract status as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about A123 Systems and its business, issued or adopted by the Company, materially false and misleading.

30.     Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of A123's common stock by disseminating materially false and misleading statements and/or omitting and/or concealing material adverse facts.  The scheme:  (i) deceived the investing public regarding A123's business, operations and management, and the intrinsic value of A123's common stock; and (ii) caused Plaintiffs and other members of the Class to purchase A123's common stock at artificially inflated prices.  When the truth was revealed, the price of A123's common stock dropped, thereby damaging Plaintiffs and other members of the Class.

## CLASS ACTION ALLEGATIONS

31.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the Class of all persons who purchased or otherwise acquired A123's common stock during the Class Period, which encompasses February 28, 2011 to March 26, 2012, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had, during the Class Period, a controlling interest.

32.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, A123's common stock was actively traded on the NASDAQ.  As of March 2012, the Company had over 146 million shares issued and outstanding in the United States.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by A123

Systems or its transfer agent and may be notified of the pendency of this action by mail and/or using the form of notice similar to that customarily used in securities class actions.

33.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

34.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include:

      a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

      b.    whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the manufacture of the  Prismatic Battery, the capacity of the Company's Livonia facility, the Company's product performance generally, and its business, operations, future prospects, and management of A123 Systems; and

      c.    the extent to which members of the Class have sustained damages and the proper measure of damages.

35.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

36.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small,

the expense and burden of individual litigation makes it impracticable for members of the

Class to individually redress the wrongs done to them.

## SUBSTANTIVE ALLEGATIONS

### Background

37.     A123 Systems develops, manufactures, and sells advanced lithium-ion

batteries and energy storage systems that deliver high power and energy dense long-life

batteries.

38.     A123's flagship product is the Prismatic Battery -- the "AMP20 Lithium Ion

Prismatic Cell."  Batteries are generally cylindrical.  Prismatic cell batteries, however, are a

new and different type of battery.  Unlike standard batteries, prismatic cell batteries are flat

and shaped like a prism; they are not rolled into a cylinder.  The energy storage system of the

Prismatic Battery involves a battery pack that includes a number of prismatic cells wired in

series, and groups of those serially wired cells wired in parallel.  The connections then are

welded together.

39.     According to the Company, the Prismatic Battery "is built to deliver high

energy and power density combined" and "demonstrates industry-leading abuse tolerance

coupled with excellent life performance under the most rigorous duty cycles."

### The Prismatic Battery

40.     The Prismatic Battery enables the Company's customers to commercialize

innovative products for the transportation, electric grid, and commercial markets.   In the

transportation industry, A123 Systems works with major global automotive manufacturers

and suppliers to develop batteries and battery systems for hybrid electric vehicles, plug-in

hybrid electric vehicles ("PHEVs"), and electric vehicles ("EVs").  The Company designs

and develops batteries and battery systems for multiple vehicle models at BAE Systems,

BMW AG, General Motors Company, Fisker Automotive, Inc. ("Fisker"), and Shanghai Automotive Industry Corp., among other customers.   Throughout the Class Period, Fisker was A123's largest customer, accounting for approximately 25% of its revenues.

**A123's Relationship with Fisker Was Critical to its Success**

41.     A123 Systems estimated that its fourth quarter revenue from Fisker alone would make up approximately one quarter of its entire 2011 revenue.  On May 9, 2011, the Company announced that "[e]ven more importantly, in the first quarter [of 2011], we commenced volume production of battery systems for Fisker" and that the "ramping of this program reinforces our expectation for a revenue inflection point beginning in the second quarter."

42.     The Company trumpeted its agreement with Fisker in a press release dated January 14, 2010:

> "Fisker Automotive selected A123 ***because of the company's ability to meet our performance needs*** and rapidly scale to our production volume," said Henrik Fisker, Chief Executive Officer of Fisker Automotive. "Fisker is committed to developing environmentally friendly cars that don't sacrifice style or performance. A123's technology will ensure the Karma delivers."
>
> ***
>
> "We believe the opportunity to supply batteries for Fisker's premium plug-in hybrid vehicles is further confirmation of the competitive advantages of A123's technology, including our ability to deliver on the critical safety, high power, useable energy and extended life requirements for PHEV applications," said David Vieau, President and Chief Executive Officer of A123 Systems. "A123 looks forward to a long partnership with Fisker Automotive that will help advance the future of transportation, improve fuel economy and reduce global $CO(2)$ emissions."

(Emphasis added.)

43.     A123 was not capable, however, of satisfying Fisker's production requirements in number or quality.

44.     Furthermore, A123 Systems is a Fisker shareholder.

**A123's Dire Financial Condition Prior to the Fisker Contract**

45.     Prior to winning the Fisker contract, A123 was in precarious financial health. A123 had suffered three consecutive years of negative cash flow from operating activities, experiencing net losses of $80 million in 2008, $87 million in 2009, and a staggering loss of $153 million in 2010.  The Company's cash and cash equivalents decreased drastically by 28% in the last quarter of 2010, from $300.8 million on September 30, 2010, to $216.8 million on December 31, 2010.   Confidential witnesses who are former Fisker employees confirm that A123 was struggling financially and that financial issues clouded A123 and Fisker's discussions regarding the fulfillment of the contract.

**A123 Touted the Quality of Its Manufacturing Process and the Prismatic Batteries**

46.     A123 Systems frequently touted the qualities of its manufacturing process and the Prismatic Battery.  For example, in a Company press release dated January 14, 2010, Defendant Vieau said:

> For close to four years, A123 Systems has demonstrated its ability to manufacture advanced lithium ion batteries in scale and at *extremely high quality levels*, and we are now expanding our capacity to ensure customers and prospects that we can scale with them to meet expected strong demand in the years ahead.

(Emphasis added.)

47.     A123 Systems also emphasized that the "next-generation prismatic batteries" are "highly engineered to incorporate safety and control features that extend life and improve performance."

48.     In stark contrast to A123's public statements boasting the superior "competitive advantages of A123's technology, including [its] ability to deliver on the critical safety, high power, usable energy and extended life requirements for PHEV applications," numerous confidential witnesses paint a different story:  a story of a company knowingly producing defective products utilizing a flawed manufacturing process.

49.     Despite touting its "high quality" manufacturing of Prismatic Batteries, the manufacturing process at Livonia was utterly flawed, ensuring that the Prismatic Batteries manufactured there were riddled with defects.  Such flaws included: 1) a defective welding process that resulted in part from defective welding tabs; 2) improperly coated electrode plates that were inserted into the prismatic cells, causing additional damage at later points in the production process; 3) widespread contamination of the Prismatic Battery parts due to egregious violations of quality control protocols caused by employees removing parts and examining them by hand; and 4) improper inclusion in A123's batteries of parts classified as defective by the quality control team.   As demonstrated below, these fatal flaws in the Company's manufacturing process were well known to the Company from the outset of and throughout the Class Period.

**A123's Manufacturing Process Was Not Capable of Satisfying Fisker's Demands**

50.     A123 was incapable of producing sufficient Prismatic Batteries to satisfy Fisker's requirements.

51.     CW 1 was a cell manufacturing supervisor at A123's Livonia facility until early 2012.  CW 1 explained that the original start date for the Livonia plant was set for June 22, 2010, but A123 had no equipment on that date.  Equipment installation was put on a fast track and no buy-offs or trial runs were performed on any of the equipment.  Although its

manufacturing process was not performance tested, A123 started full-scale production the minute the equipment was installed in order to meet Fisker's demands.

52.    CW 2, a former Fisker employee who regularly interfaced with A123's employees at the Livonia facility, remarked that from the very start of A123's partnership with Fisker, "Fisker pushed A123 to get the batteries out" as quickly as possible.  According to CW 2, coming to the program in late 2009 or Q1 2010, A123 did not have a lot of time to ramp up manufacturing.  What's more, manufacturing the Prismatic Batteries was a process entirely new to A123:  "A123 was a new company with new customers and new technology."

53.    CW 2 stated that in order to meet Fisker's production demands, "A123 did not hold their own internal standards."  Employees from both Fisker and A123 voiced concerns at monthly meetings held between Fisker's energy storage team and A123's staff about the alarming, accelerated pace of manufacturing and the shortcuts in internal controls.

54.    Incredibly, although the launch was not successful, production was nevertheless ramped up from 1,000 cells to 11,000 cells per day.

55.    CW 3 corroborated that A123's manufacturing process was "extremely loose."  CW 3 explained that operations were originally run at a Korean plant.  When operations were transferred to Livonia, the only operating instructions to the Livonia employees were **in Korean**, which the employees translated into English using a free Internet program called "Google translate," hardly the manner of developing the cutting-edge technology that A123 was touting to investors.  CW 3 observed that there were people sent from Korea to help, but as their English was not good, "it was pretty much a watch and try to learn" situation.

56.     CW 1 similarly remarked that A123 was entirely unprepared to manufacture the Prismatic Batteries.  CW 1 observed that A123's goal of 5,000 cells per day at one point was pushed to 7,500 and later to a staggering amount of 11,000 cells per day, but the plant process capacity was not capable of handling cell formation on that scale.  Even so, A123 ramped up the process, running 24 hours a day, 7 days per week.

57.     CW 4, who worked at the Livonia plant from its inception until the Spring of 2012, similarly observed that the Livonia plant launched too soon.  In plant-wide meetings headed by Plant Manager Meera Vijan and Materials Manager Margaret Peet in 2010, CW 4 and other employees voiced concerns that everything was happening "too soon" and was impacting cell grading and the monitoring of cells.  A123 had issues with "inferior" prismatic cells "from the very beginning."  According to CW 4, the Vice President of Operations, Lou Golato, did not care about quality.  His attitude was "build, baby, build," no matter what was being done, without ever stopping the equipment to check for quality.  In 2010, CW 4 offered to sit down with every employee to help define the process flow, but Karl Schmidt, A123's Director of Logistics and Material Operations, told CW 4 that the company did not need it.  CW 4 recalled complaining in the monthly meetings to Vijan about the accelerated pace of the manufacturing process, but Vijan responded that it was what Lou Golato wanted.  During the summer of 2011, CW 4 participated in brainstorming walks through the warehouse, where CW 4 saw stacks of prismatic cells.  There were so many different grades of cell that Karl Schmidt, John Koyne (Senior Director of Global Purchasing), Margaret Peet (Materials Manager), and Dean Shaska (Senior Finance Officer) walked around the warehouse saying, "Guys, what are we going to do?  Who's got an idea of how we can deal with this?"

## A123 Tossed Safety and Quality Out the Window

58.     In an attempt to meet production quotas and satisfy Fisker, A123 ignored

quality control procedures resulting inevitably in the production of defective Prismatic

Batteries.   Although employees were initially told how critical it was to follow the proper

quality control procedures, according to CW 3, when push came to shove, quality control

procedures were entirely ignored and discarded.

59.     According to CW 3, although the stamped material could only stay in the

stamping room environment for one day, or possibly two at most, because it would otherwise

absorb moisture and damage the battery, there were times when the material was sitting in

the stamping room for weeks at a time.   CW 3 was repeatedly told that everything was fine,

although CW 3 and others knew that when the material would sit, the cathode or anode

coatings would absorb moisture from the air, further damaging the batteries.   The "answer"

to the excess absorption problem was to "just bake them longer," but how much time was

required to "bake out" excessive moisture was all guess-work and caused further damage.

60.     CW 1 corroborated CW 3's description of the moisture absorption problems.

CW 1 also explained that bake settings on the ovens were changed between a half dozen and

a dozen times, because A123 did not know at what settings to bake the electrodes in order to

achieve the proper parts-per-million moisture levels.   This was an issue, because the moisture

mixed with the electrolyte also could trigger explosions.   According to CW 1, "baking"

would sometimes cause the material to further deteriorate, but parts would go to the "cell

formation" room anyway, with the result that "these cells literally exploded.   We would have

fires there on a regular basis."   CW 1 explained that since the welding process was

automated, when the improperly welded tabs touched another metal (i.e., electrolyte, a hazardous chemical), a fire would start.

61.     Even worse, CW 3 observed that although A123's operating procedures allowed only a maximum of 24 magazines of electrode stampings, at its peak A123 had a staggering 270 magazines in the stamping room.  The proper procedure would have been to have 6 magazines being built, while 6 went out the door.

62.     CW 5, a former A123 employee in the Quality Control group at the Livonia facility, explained that when the material came in to the Livonia facility, it was "all bad, always was bad.  The spec always was off.  When you put it in the oven, the moisture--it always failed.  Weld test always failed.  The stacking machines always failed.  The packaging machine always had a problem."

63.     CW 5 remarked that A123 "didn't listen to quality" and the recommendations of the quality control team were repeatedly rejected.  CW 5 explained that there were a lot of quality control alerts and remarked that "that's why it is not going to last, and I told them that.  They are going to blow somebody up."  CW 5 observed that the Plant Manager, Ms. Vijan, let a lot of material pass in order to meet A123's production quotas.

64.     CW 1 stated that the previous Quality Manager quit because "he was 100% not allowed to follow the quality process."  People in quality control were shot down and told "we will run."  According to CW 3, the Quality Department fought about problems regularly.  An Operations Manager who championed better quality left A123 abruptly and was replaced by another who had a much more relaxed view about quality.  What's more, employees' questions about the safety and propriety of A123's manufacturing process were completely ignored.

65.     A123 knowingly allowed the flawed manufacturing process to continue, thereby continuing the production of faulty Prismatic Batteries.  For example, CW 3 explained that the rolls of coated strip (i.e., the electrode plates) that needed to be stamped as part of the production process had exposed metal, meaning the strip was not coated properly. Although the edges of the strips were dented or smashed, employees were nevertheless instructed to process the material.  According to CW 3, it was obvious that the bad stampings were going to fail, but nothing was done to stop the faulty process.  A123 exacerbated the problem by contaminating the batteries through an improper inspection by hand.   CW 6, a former A123 employee involved in production at the Livonia plant from mid-2010 until the fall of 2011, similarly observed that the materials were contaminated because the employees were removing the parts from the automated machines and inspecting them by hand, causing chipping and thereby exposing bare metal.

**Defendants Knew of the Flawed Manufacturing Process and Resulting Defective Prismatic Batteries**

66.     A123 knowingly produced defective Prismatic Batteries, ignoring the vocalized concerns of its employees.

67.     The operations at the Livonia facility were overseen on a daily basis by Mr. Lou Golato, the Vice President of Operations.  He had an office in the plant.  Mr. Golato was a member of A123's Executive Committee and reported to the Individual Defendants.  Even though Mr. Golato was a member of senior management, he frequently attended the factory floor to oversee production.  The plant manager, Ms. Meera Vijan, reported directly to Mr. Golato.

68.     According to CW 1, Mr. Golato was well aware of the defects that riddled the Prismatic Batteries.  Indeed, according to CW 1 and CW 3, the quality defects were so

obvious and pervasive that A123 stored defective parts of the Prismatic Batteries in an off-site warehouse.  According to CW 3, "everything we built was no-good, it was all over in a warehouse by metro [Detroit] airport; boxes and boxes of no-good cells."  Mr. Golato oversaw the warehousing of the defective batteries.

69.     Furthermore, according to CW 1, it was evident to everyone involved in the manufacture of the Prismatic Batteries that the batteries were riddled with defects.  CW 1 noted that on several occasions the Prismatic Batteries exploded, causing fires at the Livonia plant.  The occurrence of fires resulting from defective Prismatic Battteries at the Livonia facility was corroborated by CW 5 and the Livonia Fire Department confirmed that it attended fires at the plant on April 12, 2011 and June 26, 2011.

70.     Despite the known defects, Mr. Golato continued to direct the Plant Manager, and, through Ms. Vijan, the employees, to produce Prismatic Batteries without addressing the plethora of quality issues.  The Plant Manager kept pushing employees to maintain production even after Ms. Vijan was specifically informed of manufacturing defects.  According to CW 3, s/he advised Meera Vijan that the continued production of the Prismatic Batteries without addressing quality issues would result in the manufacture of overwhelmingly defective batteries.  According to CW 3, however, Ms. Vijan again continued to push production, stating that "[i]f 1500 or 2000 fail, we'll just take the 20 good ones that come off the roll."  CW 3 stated, "we had to show that we were capable of supplying Tier 1 supplies" and "quality was sacrificed for production."

71.     CW 4 recalled sitting in a meeting in early-2011 at the Livonia plant regarding inventory controls and process.  "Management was very aware that there was a problem."  CEO David Vieau was in the meeting, along with Dean Shaska and others.  CW 4 was very

frustrated in the meeting because CW 4 felt that all of the problems could have been prevented because CW 4 and others had made suggestions to improve these areas.  CW 4's concerns were very well documented to management.  Management told CW 4 to "keep [his/her] mouth shut."  In CW 4's exit interview with A123 Human Resources Manager, John Gamache, CW 4 explained to Gamache that CW 4 had repeatedly raised concerns about the lack of process and controls at the Livonia plant.  CW 4 also told Gamache about CW 4's discovery of the weld tab feeder error in mid-2011, and that CW 4 was told it was not CW 4's concern.  CW 4 emphasized to Gamache that in every instance CW 4's concerns were ignored by plant managers and Karl Schmidt.

**A123 Anticipated the Battery Recall But Continued to Mislead Unsuspecting Investors**

72.     Defendants knew well before its March 26, 2012 public announcement that it was going to have to spend significant funds to repair and replace defective Prismatic Batteries.  Many confidential witnesses confirmed this fact.

73.     For example, when asked about A123's belated public disclosure on March 26, CW 3 observed that "A123 made a lot of public, flat-out lies."  CW 3 said that the announcement about the welder was not entirely accurate and did not cover all the problems related to the defective batteries.  CW 3 observed that A123 had been aware of the defects in the tab welding equipment for an extremely long time.

74.     CW 1 explained that A123 had problems with the four sonic welders from the Livonia plant's inception in September 2010.  CW 1 reiterated that the welders were never performance tested and the batteries were contaminated.  CW 1 remarked that the Company was misleading its shareholders "leading them to believe that they have good intentions on entering into the green market."

75.    CW 4 stated that A123 knew about a reduction in Fisker's order of batteries well before A123 made the public announcement in November 2011.  CW 4 said that his/her colleagues were discussing Fisker's reduction in orders weeks before the public announcement.

76.    CW 3 similarly observed that A123 was fully aware that the batteries were defective:  "From my understanding, everything, everything, that we built from my time starting there to basically when I left was no good."  CW 3 was employed at the Livonia facility from its inception until October 2011.  CW 3 stated that A123's public statements about the quality of its batteries were "kind of white-washed."

77.    CW 7, a former A123 engineer, stated that the Company had difficulty with its Prismatic Batteries from the very beginning and that during CW 7's employment A123 never had a fully-satisfactory product.  CW 7 explained that there were temperature issues (i.e., expansion and contraction) and issues with the prismatic cells and with the welding together of the individual units as a horizontally stackable product.  According to CW 7, executive management must have been aware of the issues with the Prismatic Batteries, since "the prismatic is their flagship.  They've put all their apples into that thing."

78.    CW 2 recalls that of the Karmas sold, "hundreds" were recalled because upon Fisker's inspection of the batteries, inconsistencies were discovered in the battery production and quality that led to battery failures.  CW 2 thought the recall covered all cars manufactured to that point, as well as all of the batteries manufactured to that point.  The cost for A123 to replace the batteries already sent to Finland at the time of the recall was "significant because they had to ship the batteries back to A123 or [A123] had to send people

to Finland." According to CW 2, "A123 would have a hard time defending that the issue did

not impact all of the batteries" due to internal control issues at its Livonia plant.

79.     CW 8, a former Fisker engineer, also observed that Fisker first noticed battery

issues in June 2011. The battery issue "kept coming up all during the launch" of the Karma.

CW 8 recalled hearing colleagues say in June 2011 that "we've got a problem with the

battery and it could be a big issue." That battery issue led to a "major failure. It was

catastrophic." The failure was caused by Fisker's supplier -- A123.

**Materially False and Misleading Statements Issued During the Class Period**

80.     Throughout the Class Period, the Company failed to disclose the flaws in its

manufacturing process and the resultant defects in the Prismatic Batteries. The Company also

omitted to incorporate the impact of the defective battery on the Company's revenue and

expenses in its financial reports. Instead, the Defendants publicly touted its Prismatic

Batteries and the Company's associated revenue growth.

81.     On February 28, 2011, the Company issued a press release announcing its

financial results for the fourth quarter and year ended December 31, 2010. The Company

reported increased revenue for the fourth quarter and the year ended December 2011, and

Defendant Vieau stated that "***we continue to be optimistic about the expected long-term***

demand for advanced battery systems, as well as A123's technology and market leadership

position." (Emphasis added.) Within the same press release Defendant Vieau stated that:

> While costs for our capacity expansion are higher than originally
> anticipated, they support plans that we believe will enable A123 to
> be a leading market share supplier in each of our target
> markets. We expect to see an inflection point in our revenue in the
> second quarter of 2011 with several customer programs scheduled
> to enter volume production.

82.     On March 11, 2011, the Company filed an annual report for the period ended

December 31, 2010, on Form 10-K with the SEC, which was signed by, among others,

Defendants Vieau and Granara, and reiterated the Company's previously announced annual

financial results and financial position.  In addition, the Form 10-K contained signed

certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Vieau and

Granara, stating that the financial information contained in the Form 10-K was accurate and

that it disclosed any material changes to the Company's financial reporting.

83.     The 10-K represented the following:

> Our cylindrical batteries are in volume production and are
> commercially available for use in automotive and heavy duty
> vehicles. Our next generation prismatic batteries are currently
> being produced in our Livonia, Michigan facility, which officially
> opened on September 13, 2010.  This 291,000 square foot facility
> is designed to enable the complete production process, including
> research and development, **manufacturing of high-value
> components**, cell fabrication, module fabrication and the final
> assembly of complete battery packs ready for vehicle integration.
>
> ***
>
> *AMP20*. The AMP20 (7.2 mm thick, 161 mm wide, 227 mm in
> height) is designed for high-power PHEV and EV applications.
> Our 20Ah building block for PHEV and EV applications is
> currently in production. This prismatic cell is an advanced high
> power and long-life lithium-ion energy storage solution for next-
> generation applications and is being used in the Fisker Karma
> PHEV, among other applications.
>
> ***
>
> Our prismatic battery system's design allows for various battery
> configurations, providing pack design versatility for the
> automotive market. This design reduces retooling time when
> reconfiguring our assembly lines for different customers. **Our
> battery systems are highly engineered to incorporate safety and
> control features that extend life and improve performance.
> Module-level fusing, temperature sensing and other safety
> controls provide additional containment safeguards to isolate and
> protect against cell-level failure. Active overvoltage protection**

> *provides monitoring and balancing of individual series elements*
> *to protect cells from abuse and to extend life.* These battery
> systems are designed to accommodate either liquid or air-cooled
> thermal management systems, and have mechanical structures
> designed to withstand the harsh vibration and mechanical shock
> environment of automotive applications.

(Emphasis added.)

84.     The statements referenced in ¶¶ 81-83 above were materially false and/or

misleading because they failed to disclose that the Company's Prismatic Batteries were

flawed; the process for manufacturing the Prismatic Batteries at its Livonia, Michigan facility

was flawed; the flawed process resulted in defective Prismatic Batteries; and the defective

nature of the batteries had a significant and material adverse impact on the Company's

revenue and expenses and jeopardized its relationship with its customers.

85.     On May 9, 2011, the Company issued a press release announcing its financial

results for the first quarter ended March 31, 2011.  In the press release, Defendant Vieau

stated that:

> Even more importantly, in the first quarter, we commenced volume
> production of battery systems for Fisker. The ramping of this
> program reinforces our expectation for a revenue inflection point
> beginning in the second quarter.  We continue to expect strong
> revenue growth throughout the second half of the year as well,
> which is supported by our customers already in production, as well
> as a number of customer programs that are expected to enter
> production during the year, including BMW, Daimler, and
> Navistar.

86.     On May 10, 2011, the Company filed a quarterly report on Form 10-Q for the

period ended March 31, 2011, with the SEC, which was signed by Defendants Vieau and

Granara.  The report reiterated the Company's previously announced quarterly financial

results and financial position.  In addition, the Form 10-Q contained signed certifications by

Defendants Vieau and Granara, stating that the financial information contained in the Form

10-Q was accurate and that they disclosed any material changes to the Company's financial reporting.

87.     The statements referenced in ¶¶ 85-86 above were materially false and/or misleading because they failed to disclose that the Company's Prismatic Batteries were flawed; the process for manufacturing the Prismatic Batteries at its Livonia, Michigan facility was flawed; the flawed process resulted in defective Prismatic Batteries; and the defective nature of the batteries had a significant and material adverse impact on the Company's revenue and expenses and jeopardized its relationship with its customers.

88.     On August 4, 2011, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2011.  For the quarter, the Company reported an increase in revenue and Defendant Vieau stated: "We doubled our revenue from the first quarter, due largely to the fact that we started shipping prismatic modules and packs in volume to Fisker and Smith Electric Vehicles."  In the same press release, Defendant Vieau stated:

> We continue to anticipate that revenue for the full year will more than double from 2010 as volumes continue to climb in the second half of the year.  In conjunction, *A123 will be in an increasingly strong position to drive efficiencies in our manufacturing processes and position our company for profitable growth in the years ahead.*

(Emphasis added.)

89.     On August 5, 2011, the Company filed a Form 10-Q quarterly report for the period ended June 30, 2011, with the SEC, which was signed by Defendants Vieau and Prystash, and reiterated the Company's previously announced financial results and financial position.  In addition, the Form 10-Q contained signed certifications by Defendants Vieau

and Prystash, stating that the financial information contained in the Form 10-Q was accurate and that it disclosed any material changes to the Company's financial reporting.

90.     During an analyst call associated with the release of the Company's second quarter results, A123's management again stated that Fisker was a key driver to revenue growth, "requiring the company to be at a 300 per week run-rate by November, i.e. $56 million quarterly run rate."

91.     The statements referenced in ¶¶ 88-90 above were materially false and/or misleading because they failed to disclose that the Company's Prismatic Batteries were flawed; the process for manufacturing the Prismatic Batteries at its Livonia, Michigan facility was flawed; the flawed process resulted in defective Prismatic Batteries; and the defective nature of the batteries had a significant and material adverse impact on the Company's revenue and expenses and jeopardized its relationship with its customers.

92.     On September 12, 2011, the Company reaffirmed its 2011 revenue guidance of $210 million to $225 million, and highlighted Fisker's importance to A123's revenue, noting that Fisker is anticipating ordering 300 units per week in the fourth quarter of 2011.

93.     The statements referenced in ¶ 92 above were materially false and/or misleading because they failed to disclose that the Company's Prismatic Batteries were flawed; the process for manufacturing the Prismatic Batteries at its Livonia, Michigan facility was flawed; the flawed process resulted in defective Prismatic Batteries; and the defective nature of the batteries had a significant and material adverse impact on the Company's revenue and expenses and jeopardized its relationship with its customers.

**The Truth Slowly Emerges While A123 Engages In a Cover Up**

94.      On November 4, 2011, A123 Systems abruptly revised its 2011 revenue guidance downward by approximately 22% "due to an unexpected reduction in orders for battery packs from Fisker for the fourth quarter as it balances inventory levels from all suppliers."  The news caused A123's stock price to drop 10% to $3.17 from $3.53 on November 3.

95.      The Company, however, downplayed the downward revision, stating that it is "temporary" and underscoring that its relationship with Fisker remained strong.  Despite disclosing the "unexpected" reduction in Fisker's orders, the Company again failed to disclose the Prismatic Batteries' defects, and instead remained optimistic about its future earnings.

96.      The statements referenced in ¶¶ 94-95 above were materially false and/or misleading because they failed to disclose the true reason for the "unexpected reduction," i.e. A123's batteries were defective.  Furthermore, these statements were materially false and/or misleading because they failed to disclose that the Company's Prismatic Batteries were flawed; the process for manufacturing the Prismatic Batteries at its Livonia, Michigan facility was flawed; the flawed process resulted in defective Prismatic Batteries; and the defective nature of the batteries had a significant and material adverse impact on the Company's revenue and expenses and jeopardized its relationship with its customers.

97.      In light of A123's continued upbeat comments about the future, analysts remained "bullish on the long-term prospects for [A123], as [they] believe[d] current contracts imply a significant market share of the automotive lithium-ion industry and the

potential for $1bn of revenue in the 2013/2014 time-frame (of which $100mm is Fisker, at 7,500 units per year)."

98.     On November 9, 2011, the Company released its third quarter results, showing an increase of 145% from the same quarter in 2010, and an increase of 77% from the prior quarter.  The spike was largely attributed to Fisker:  "[i]t is unfortunate that the dramatic increase in our revenue run rate during the second quarter and third quarter will not continue into the fourth quarter as Fisker balances inventory across its overall supplier base."  Even though the Company noted the reduction in Fisker orders, A123 Systems insisted that "it remain[ed] optimistic about Fisker" and that it "remained on track to deliver substantial revenue growth during 2011 and continue[d] to be optimistic about [its] long-term goal."  Although it signaled a "dramatic drop" in the fourth quarter while Fisker "do[es] inventory adjustments," A123 reiterated that "Fisker continues to be a significant percentage" of the Company's revenues for 2012 and 2013.

99.     Also on November 9, 2011, the Company filed a quarterly report for the period ended September 30, 2011, on Form 10-Q with the SEC, which was signed by Defendants Vieau and Prystash and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications by Defendants Vieau and Prystash, stating that the financial information contained in the Form 10-Q was accurate and that it disclosed any material changes to the Company's financial reporting.

100.    The statements referenced in ¶¶ 98-99 above were materially false and/or misleading because they failed to disclose that the Company's Prismatic Batteries were flawed; the process for manufacturing the Prismatic Batteries at its Livonia, Michigan facility

was flawed; the flawed process resulted in defective Prismatic Batteries; and the defective nature of the batteries had a significant and material adverse impact on the Company's revenue and expenses and jeopardized its relationship with its customers.

101.    On November 26, 2011, less than three weeks after the November 9, 2011 earnings announcement and filing of the September 30, 2011 10-Q, A123 Systems laid off 125 workers at its Michigan plants.   The Company attributed the cut to Fisker's reduced orders.

102.    Despite making a plethora of public statements between the commencement of the Class Period on February 28, 2011 and December 23, 2011, touting the superiority of its product, the Defendants did not disclose that in reality the Prismatic Batteries were riddled with defects.

103.    Thereafter, Defendants continued to lie to investors.  On December 21, 2011, it was reported that Fisker was recalling all of its Karma vehicles made between July 1, 2011 and November 3, 2011.  Two days later, Defendant Vieau authored a memo addressed to "A123 Systems Customers, Partners, Investors and all other Stakeholders" announcing that A123 Systems "ha[s] determined that *some* of the battery packs [it] produce[s] for Fisker Automotive could have a potential safety issue relating to the battery cooling system," which in "certain" unspecified "rare circumstances" could "possibl[y]" cause a leak leading to an electrical short circuit.  Defendant Vieau claimed that "fewer than 50 customer cars are involved in this action," despite NHTSA's announcement two days earlier that the potential number of units affected was 239.   Defendant Vieau proclaimed that the Company "expect[ed] this situation to have *minimal* financial impact on A123."  (Emphasis added.)

104.    The statements referenced in ¶ 103 above were materially false and/or misleading because they failed to disclose that the Company's Prismatic Batteries were flawed; the process for manufacturing the Prismatic Batteries at its Livonia, Michigan facility was flawed; the flawed process resulted in defective Prismatic Batteries; and the defective nature of the batteries had a significant and material adverse impact on the Company's revenue and expenses and jeopardized its relationship with its customers.

105.    On January 10, 2012, A123's CFO David Prystash and the Head of Automotive Jason Forcier participated in a Deutsche Bank Global Auto Industry Conference. Mr. Forcier claimed that A123 had been "taking a hard look at [its] designs" and found a "fairly minor" issue with a cooling clamp:

> Obviously we were taking a hard look at our designs along with our customer base and from that found that a cooling clamp could be put on like this, instead of like this. And when you put it on like this, it interferes with the cover of the pack, which could cause the clamp to open. And theoretically then, coolant could leak out because there wasn't enough pressure on the coolant clamp into the pack and you could have a similar situation as to what, the one GM observed.
>
> We never observed anything in the field that was related to any kind of thermal instance, but we thought it prudent to fix those 35 to 50 cars that were in the field and that's what we did. So from a cost impact standpoint it's not significant. We'll talk more about it, I think, in our Q4 call, but there were about 50 cars in the field. We went out, replaced those battery packs and then we fixed the inventory that Fisker had. And really the cost to do the fix is just the labor to drop the pack, open it up, turn the connector and put it back on.

106.    The statements referenced in ¶ 105 above were materially false and/or misleading because they failed to disclose that the Company's Prismatic Batteries were flawed; the process for manufacturing the Prismatic Batteries at its Livonia, Michigan facility was flawed; the flawed process resulted in defective Prismatic Batteries; and the defective

nature of the batteries had a significant and material adverse impact on the Company's revenue and expenses and jeopardized its relationship with its customers.

107.    On March 1, 2012, A123 Systems announced preliminary financial results for the fourth quarter of 2011, with revenues expected to be "a 64% increase" from the fourth quarter of 2010.  A123 Systems professed to "have taken a number of actions to improve [its] manufacturing efficiency, including the addition of a new COO, who is leading [A123's] efforts to reduce costs, improve quality, and better utilize assets," resulting in "early indications of manufacturing yields for prismatic cells produced in Michigan reaching our target range."  The Company issued preliminary revenue guidance for 2012, anticipating that revenue will be "in the range of $230mm to $300mm, representing 67% growth from 2011 at the midpoint."  Based on the pre-released results, analysts remained bullish on the stock in the long term and retained their "Buy" recommendation:  "We continue to see [A123] as having a strong technology that is enabling the company to win significant contracts in a rapidly growing sector."

108.    On March 8, 2012, A123 Systems announced its financial results for the fourth quarter and full year of 2011.  The results were consistent with the preliminary results announced on March 1, 2012, with the Company predicting "strong revenue growth and improv[ed] profitability margins during 2012."  A123 Systems also touted its "strong technology" with the release of its 2011 results.  On the same day, however, Consumer Reports reported that while conducting speedometer calibration runs on its test track with a Fisker Karma, the car's "dashboard flashed a message and sounded a 'bing' showing a major fault."

109.    On March 8, 2012, A123 held an earnings call to discuss the fourth quarter

2011 results.  A123 continued to mislead investors.  David Vieau stated the following:

> During the fourth quarter, we faced challenges that impacted our
> financial results, but we've taken actions to address these issues. . .
> . We are providing guidance that reflects strong revenue growth,
> increased customer diversification across our target markets, and
> improved profit margins in 2012 and 2013.
>
> * * *
>
> We also incurred a non-cash fair value impairment related to our
> Fisker investment, and a non-cash asset impairment charge related
> to the relocation of our operations in Korea, which we plan to
> consolidate into other operations.  David will provide additional
> details on those expenses, but it's important to understand that we
> believe we have our arms around all of these issues, and we're
> already seeing results from some of the changes we have
> implemented.
>
> * * *
>
> There were two specific items that we dealt with.  One of them had
> been very highly discussed, which is a Fisker program where we
> had problems with hose clamps.  Now these are mechanical clamps
> on flexible hoses that basically was a mechanical impingement on
> those that occurred in the manufacturing operation.  The testing
> that we had done on those systems that would normally detect that
> were done before the mechanical covers were put in place.  And
> unfortunately, that test wasn't sufficient to cover it.  So we ended
> up with some of that leaking out into the field, and we had to go
> off and replace battery packs for 35 customers in the field, and
> some of those are dealers.
>
> We did identify this and in identification of it found the root cause
> of it and took corrective action and completed all repairs and
> replacements of existing packs within two weeks.  So we think we
> did a good job of containing that particular issue.   And we
> understand what the root cause of it was from a design and
> manufacturing standpoint and it has been taken care of and
> corrected.  ***It certainly had nothing to do with the integrity of the
> packs themselves or the cells or the systems.***  It was really related
> to a $0.10 hose clamp, frankly, improperly applied.

(Emphasis added.)

110.     On March 12, 2012, the Company filed an annual report for the year ended

December 31, 2011, on Form 10-K with the SEC, which was signed by, among others,

Defendants Vieau and Prystash, and reiterated the Company's previously announced annual

financial results and financial position.  In addition, the Form 10-K contained signed

certifications pursuant to SOX by Defendants Vieau and Prystash, stating that the financial

information contained in the Form 10-K was accurate and that it disclosed any material

changes to the Company's financial reporting.

111.     Defendants stated in the 10-K the following:

> Our cylindrical batteries are in volume production and are
> commercially available for use in automotive and heavy duty
> vehicles. Our next generation prismatic batteries are currently
> being produced in our Livonia, Michigan facility, which officially
> opened in September, 2010. This 291,000 square foot facility
> enables the complete production process, including research and
> development, **manufacturing of high-value components**, cell
> fabrication, module fabrication and the final assembly of complete
> battery packs ready for vehicle integration.
>
> ***
>
> *AMP20.* The AMP20 (7.2 mm thick, 161 mm wide, 227 mm in
> height) is designed for high-power PHEV and EV applications.
> Our 20Ah building block for PHEV and EV applications is
> currently in production.  This prismatic cell is an advanced high
> power and long-life lithium-ion energy storage solution for next-
> generation applications and is being used in the majority of our
> transportation customers and a growing percentage of our grid
> customers.
>
> ***
>
> Our prismatic battery system's design allows for various battery
> configurations, providing pack design versatility for the
> automotive market. This design reduces retooling time when
> reconfiguring our assembly lines for different customers. ***Our
> battery systems are highly engineered to incorporate safety and
> control features that extend life and improve performance.
> Module-level fusing, temperature sensing and other safety***

> *controls provide additional containment safeguards to isolate and protect against cell-level failure. Active overvoltage protection provides monitoring and balancing of individual series elements to protect cells from abuse and to extend life.* These battery systems are designed to accommodate either liquid or air-cooled thermal management systems, and have mechanical structures designed to withstand the harsh vibration and mechanical shock environment of automotive applications.

(Emphasis added.)

112.    The 10-K for the year 2011 once again trumpeted the superiority and safety of its batteries:  "Our battery systems are highly engineered to incorporate safety and control features. . . ."

113.    The statements referenced in ¶¶ 107-112 above were materially false and/or misleading because they failed to disclose that the Company's Prismatic Batteries were flawed; the process for manufacturing the Prismatic Batteries at its Livonia, Michigan facility was flawed; the flawed process resulted in defective Prismatic Batteries; and the defective nature of the batteries had a significant and material adverse impact on the Company's revenue and expenses and jeopardized its relationship with its customers.

## THE TRUTH EMERGES

114.    On March 26, 2012, just weeks after releasing its 2011 10-K, in which Defendants trumpeted its Prismatic Batteries and touted A123's current and anticipated revenues, the Company disclosed in a press release "that the company has launched a field campaign to replace battery modules and packs that may contain defective prismatic cells produced at A123's Livonia, Mich. manufacturing facility," costing a massive $55 million to be "funded over the next several quarters."  The $55 million represented approximately one quarter of the Company's projected annual revenue for 2012, which the Company estimated

between $230 million and $300 million. The press release also disclosed the following, in

relevant part:

> A123 has begun building replacement modules and packs and
> expects to begin shipping them to impacted customers this week.
> The company anticipates that the cost of replacing the affected
> customer modules and packs will be approximately $55 million
> and expects it will be funded over the next several quarters . . . .

> "Recently, A123 has discovered that some prismatic cells made in
> our Livonia facility may contain a defect which can result in
> premature failure of a battery pack or module that includes a
> defective cell.  We have isolated the root cause of the defective
> cells and we are confident that we have pinpointed the source of
> the defect and corrected it.  As a result of engineering analysis and
> testing, we believe this is not a safety issue, and we have
> determined the root cause and have taken corrective actions," said
> David Vieau, CEO of A123 Systems.  "We are working to get
> replacement packs and modules to impacted customers as quickly
> as possible.  It is important to note that this defect has been
> discovered only in some prismatic cells manufactured at our
> Livonia facility. Prismatic cells produced at another A123 facility
> are not impacted.  Further, the cylindrical cells we make at our
> facilities in China for a number of other transportation programs,
> as well as the majority of our grid energy storage systems and
> commercial applications, are also not affected by this defect."

115.   Later on the same day, the Company held a conference call regarding the

recall.  During the conference call, Defendant Vieau admitted the severity of the problem:

"virtually all of the product we produced in the Livonia facility has been effectively

contaminated by this particular defect."  In addition, Vieau announced that the Company was

working with unspecified customers "to develop a schedule to get them replacement packs

and modules to quickly remedy the situation."  Moreover, Defendant Vieau disclosed the

following, in relevant part:

> A123 has discovered that some battery modules and packs
> produced with prismatic cells made in Livonia, Michigan
> manufacturing facility may contain a defect, which can result in
> premature failure of the battery pack or module, including a
> decrease in performance and reduced battery life.

\*\*\*

Recently, a small number of battery packs in the field experienced a malfunction and when we inspected these packs to determine the cause, we discovered the existence of this defect.  Upon further investigation, we determined that the root cause to be the incorrect calibration of one of four automated tab welding machines in the prismatic cell manufacturing process at our Livonia facility.  This caused a misalignment of a certain component in some prismatic cells.

\*\*\*

We have isolated the root cause of the defective cells to this single automated welding machine, and we've recalibrated it to conform with the other automated welding machines at the Livonia facility.

\*\*\*

While we cannot discuss the specific customers that are part of this campaign, there are five transportation customer production programs that have received products from A123 that potentially have defective cells.  We are working with these customers to develop a schedule to get them replacement packs and modules to quickly remedy the situation. We have begun building replacement systems and expect to begin shipping them this week.

\*\*\*

So while the initial rapid ramp-up of our Michigan operations to satisfy customer demand has resulted in near-term operational challenges, we are confident in our ability to overcome these issues.

116.    Immediately following the disclosure, Fisker announced "a significant

upgrade to the VIP Customer Care Coverage included with the purchase of all 2012 Model

Year Karma vehicles.  This new initiative will apply both to existing and future 2012 Model

Year Karma customers."  Fisker further announced the following, in relevant part:

Fisker decided to make this enhancement in response to the fact that its high-voltage battery supplier, A123 Systems, discovered a latent manufacturing defect in some prismatic cells made in Livonia, Michigan facility that could result in battery underperformance and decreased durability.  As a result, A123 is

replacing all impacted battery modules and packs for the Fisker
Karma.

*** 

**_Fisker has been working closely with A123 Systems regarding a
high-voltage battery power loss experienced in one of our
customer's vehicles, belonging to Consumer Reports._**

The problem was traced to the A123 battery pack by Fisker's
Quality SWAT Team.

(Emphasis added.)

117.    On this news, A123's common stock price plummeted $0.21 per share, or

more than 12%, to close at $1.49 per share on March 26, 2012.

118.    As a result of these disclosures, the Deutsche Bank analyst covering A123

immediately lowered his rating to "Hold," noting that "[t]he estimated cost of this action --

$55 million over the next several quarters -- represents a severe impact to a company that had

$187 million of balance sheet cash at 2011YE."  The report also stated that "we no longer

have sufficient confidence that [A123] can raise sufficient capital (without massive equity

dilution) and/or continue to augment their book of future business."

119.    As a result of this news, the Company's stock declined an additional $0.18 per

share, or nearly 13%, to close at $1.22 per share on March 28, 2012.

120.    More bad news emerged on May 11, 2012, when the Company announced

that revenue for the first quarter of 2012 was expected to be approximately $10.9 million

"below [its] expectations" and a decrease of 40% from $18.1 million in the first quarter 2011,

for a predicted net loss of approximately $125 million.

121.    The Company further stated that the anticipated net loss "includes an

estimated $51.6 million warranty expense related to the [replacement] field campaign . . .

and an estimated $15.2 million increase in inventory reserves related to battery packs,

modules and cells manufactured in Livonia, Mich. that may be defective." The Company adjusted its full-year revenue forecast downwards as it "continue[d] to anticipate completing commitments for our field campaign over the next several quarters." It also anticipated that "capacity for prismatic cell production will be constrained for the foreseeable future due to the field campaign" and that revenue in 2012 will be in the range of $145 million to $175 million, compared to prior expectations of $230 million to $300 million.

122.    On May 25, 2012, NHTSA reported that Fisker was expanding a recall of its 2012 Karma vehicles because of potential problems with the electric car's battery. The safety recall was expected to begin during May 2012, and applied to cars manufactured *from September 22, 2011 to January 20, 2012*.

### ADDITIONAL SCIENTER ALLEGATIONS

123.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading or omitted material information; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding the flawed manufacturing process and defective nature of the Prismatic Battery, their control over the materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential information concerning A123 Systems and the Prismatic Battery and its manufacture, were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew of and/or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the

investing public.  The true state of A123's flagship product and its impact on the financial condition of the Company, were not and could not have been unknown to the personnel at the highest level of the Company, including the Individual Defendants, at the time of the filing of its quarterly reports.

124.    As detailed in ¶¶ 51-79 above, Defendants knew (or were reckless in that they were aware, but acted in a highly unreasonable manner that constituted an extreme departure from the standards of ordinary care by disregarding the fact) that the manufacturing process utilized at the Livonia, Michigan, facility was flawed and the Prismatic Battery was defective, and that these facts would have a large negative impact on the Company's revenues during 2011 and the first quarter of 2012.  From the beginning of the Class Period until March 26, 2012, even as rumors of the defective nature of the Prismatic Batteries began to surface, A123 Systems simply failed to discuss or acknowledge the issue, or to inform investors of the material threat to its business that the defective Prismatic Batteries posed.

125.    As detailed in ¶¶ 51-79 above, Defendants also knew (or were reckless in that they were aware, but acted in a highly unreasonable manner that constituted an extreme departure from the standards of ordinary care by disregarding the fact) that the Company's 2011 and first quarter 2012 guidance was materially false and misleading because it did not take into account the risks and costs associated with the defective Prismatic Batteries.

126.    As detailed in ¶¶ 51-79 above, Defendants knew (or were reckless in that they were aware, but acted in a highly unreasonable manner that constituted an extreme departure from the standards of ordinary care by disregarding the fact) that the manufacturing process employed at its Livonia facility was flawed and the Prismatic Batteries were defective.

127.   At the beginning of the Class Period, Defendants knew of the flawed manufacturing process resulting in the defective Prismatic Batteries, and according to numerous former employees at A123 Systems, the Company knew about the problem from the commencement of production of the Prismatic Batteries at the Livonia plant.  Throughout the Class Period, employees reported problems with the Prismatic Batteries, customers reduced orders of the Prismatic Batteries and, as a consequence, Defendants ceased production of the Prismatic Batteries.  A number of CWs specifically advised the Plant Manager, Ms. Meera Vijan, the Vice President of Operations, Mr. Golato (a member of the Company's Executive Committee), and Mr. Karl Schmidt, A123's Director of Logistics and Material Operations, of the problems with the Prismatic Batteries.  (¶¶ 57, 63, 70, 71).

128.   Defendants were motivated to engage in the fraudulent scheme alleged herein in order to enable Defendant Vieau to sell his personally held A123 Systems common stock to the unsuspecting public at artificially inflated prices while he was in the possession of material non-public information about the Company.  Defendant Vieau sold 77,777 shares for $464,931 during the Class Period.  Accordingly, Defendant Vieau profited greatly by withholding material information and disseminating misleading information as detailed herein to the unsuspecting public.

129.   Defendant Vieau's stock sales were purportedly undertaken pursuant to a stock trading plan conforming to Rule 10b5-1 of the SEC Rules (the "Trading Plan").  The applicable Form 4 "Statement of Changes in Beneficial Ownership of Securities" documents filed with the SEC on behalf of A123 Systems in accordance with § 16(a) of the Securities Exchange Act of 1934 ("Form 4s") was signed by Eric J. Pyenson, as Attorney-in-Fact for

Defendant Vieau.  Defendant Vieau was responsible for the preparation of the Form 4s.  The Trading Plan has never been publicly disclosed.

130.    Even if Defendant Vieau's stock sales were made in accordance with the Trading Plan, Defendant Vieau was motivated to withhold the material information and not to reveal the truth about A123 Systems until the stock sales were consummated pursuant to the Trading Plan.  In withholding the material information and refraining from revealing the truth about A123 Systems, the share price of the A123's common stock remained artificially high while the sales were undertaken purportedly pursuant to the Trading Plan.  The Trading Plan was entered into as part of Defendant Vieau's scheme to defraud the investing public.

131.    Defendant Vieau was further motivated to sell his shares in A123 Systems in order to greatly increase his level of compensation over his normal salary and bonus.  According to the Company's Definitive Proxy Statement filed with the SEC on April 13, 2012, in 2011 Defendant Vieau received a salary of $431,250 and a bonus of $225,000.  According to that same Proxy Statement, Defendant Vieau also received stock awards to the value of $488,452 and option awards to the value of $222,432.  Defendant Vieau's total compensation for 2011, therefore, was $1,367,134.  As such, the amount of salary and non-equity incentive plan compensation Defendant Vieau earned in 2011 was less than half of his total compensation.

132.    Accordingly, Defendant Vieau depended on the sale of his Company stock to greatly increase his levels of compensation, personal net worth, and cash access.  This provided a clear motive for Defendant Vieau to keep the truth about the flawed manufacturing process and the defective Prismatic Battery, and the resultant impact on the Company's revenue, from investors and the market generally.

133.    Defendants were further motivated to engage in the fraudulent scheme alleged herein in order to enable Defendant Prystash to enhance his net worth.  Defendant Prystash held A123 Systems common stock at artificially inflated prices while he was in the possession of material non-public information about the Company.

134.    According to the Company's Definitive Proxy Statement filed with the SEC on April 13, 2012, in 2011 Defendant Prystash received stock awards with a value of $400,952 and option awards with a value of $1,324,610.  Defendant Prystash also received a salary of $221,442, a sign-on bonus of $25,000, and a cash incentive bonus of $122,500.  Accordingly, Defendant Prystash's total compensation for 2011 was $2,094,505.  As such, the amount of salary and non-equity incentive plan compensation Defendant Prystash earned in 2011 in proportion to his total compensation reported was only 16.4%; the balance was in stock and option awards.  In other words, nearly 85% of Defendant Prystash's compensation was directly related to the performance of the Company's stock.

135.    Accordingly, Defendant Prystash depended on the artificially inflated price of his Company stock to greatly increase his levels of compensation, personal net worth, and cash access.  This provided a clear motive for Defendant Prystash to keep the truth about the flawed manufacturing process and the defective Prismatic Battery, and the resultant impact on the Company's revenue, from investors and the market generally.

## CAUSATION AND ECONOMIC LOSS

136.    As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements and/or omitted material information about A123's manufacturing process and the Prismatic Battery; the Company's financial, investment, and business condition; and A123's business practices, and financial

and business results, prospects, and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of A123 Systems and its financial, investment and business condition, results, prospects, and operations, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period were widely disseminated to the securities markets, investment analysts, and to the investing public, and resulted in Plaintiffs and other members of the Class purchasing the Company's shares at artificially inflated prices.  Moreover, upon the managed revelation to the market and the investing public of the truth concerning A123 Systems and its results, operations, and prospects for growth, the market price of A123's shares declined substantially, resulting in significant damages to Plaintiffs and other shareholders.

137.    Had the truth about A123 Systems been revealed to the market earlier, Plaintiffs and the Class would not have purchased A123's common stock or would have purchased the stock only at dramatically lower prices.

138.    When the truth about A123 Systems was partly revealed on March 26, 2012, as detailed in ¶¶ 114-116 above, a significant portion of the artificial inflation that had been caused by Defendants' materially false and misleading statements and omissions was eliminated from the price of A123's common stock, causing significant losses to Plaintiffs and the Class.  Specifically, on March 26, 2012, the day of these partial revelations, the price of A123 Systems common stock fell 12%, to close at $1.49.

139.    When the truth about A123 Systems was further revealed after the market closed on March 28, 2012, as detailed in ¶¶ 118 and 119 above, a significant portion of the artificial inflation that had been caused by Defendants' materially false and misleading

statements and omissions was further eliminated from the price of A123's common stock, causing significant losses to Plaintiffs and the Class.  Specifically, on March 28, 2012, A123's common stock price fell 13%, to close at $11.22.

140.   Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Plaintiffs and the other members of the Class.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

141.   The market for A123's common stock was open, well-developed, and efficient at all relevant times for the following reasons (among others):

   a.   The Company's common stock met the requirements for listing, and were listed and actively traded on the NASDAQ;

   b.   As a publicly traded and regulated issuer of securities, A123 Systems filed periodic public reports with the SEC;

   c.   A123 Systems regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

   d.   The market reacted to public information disseminated by A123 Systems;

   e.   A123 Systems was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace;

f.      The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of A123 Systems common stock; and

g.      Without knowledge of the misrepresented or omitted material facts, Plaintiffs and the other members of the Class purchased or otherwise acquired A123 Systems securities during the time Defendants made the material misrepresentations and omissions, at which time the price of A123's common stock was inflated by Defendants' misrepresentations and omissions.

142.    As a result of the foregoing, the market for A123's common stock promptly digested current information regarding A123 Systems from all publicly available sources and reflected such information in A123's common stock prices.  In ignorance of the true financial condition of A123 Systems, Plaintiffs and other members of the Class, relying on the integrity of the market and/or the statements and reports of A123 Systems containing the misleading information, purchased or otherwise acquired A123's common stock at artificially inflated prices during the Class Period.  Under these circumstances, all purchasers and acquirers of A123's common stock during the Class Period suffered similar injuries through their purchase or acquisition of A123's common stock at artificially inflated prices and a presumption of reliance applies.

### THE STATUTORY SAFE HARBOR FOR
### FORWARD-LOOKING STATEMENTS IS INAPPLICABLE HERE

143.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as forward-

looking statements when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of A123 Systems who knew that those statements were false when made.

144.    Moreover, the statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to false statements or material omissions of existing facts.

COUNT I

**Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder Against all Defendants**

145.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

146.    This Count is asserted by Plaintiffs on behalf of themselves and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

147.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of A123's common stock; and (iii) cause Plaintiffs and other

members of the Class to purchase or otherwise acquire A123's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

148.    Defendants, by use of means or instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain artificially high market prices for A123's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

149.    As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.  Defendants' material misrepresentations and omissions as set forth herein violated that duty.

150.    Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the Class.  Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

151.    As a result of Defendants' fraudulent activity, the market price of A123 Systems was artificially inflated during the Class Period.

152.    In ignorance of the true financial condition of A123 Systems, Plaintiffs and other members of the Class, relying on the integrity of the market and/or on the statements and reports of A123 Systems containing the misleading information, purchased or otherwise acquired A123's common stock at artificially inflated prices during the Class Period.

153.    The market price of A123's common stock declined materially upon the public disclosure of the true facts that had been misrepresented or concealed as alleged herein.

154.    Plaintiffs' (and the Class's) losses were proximately caused by Defendants' active and primary participation in A123's scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company.  Plaintiffs (and the members of the Class) purchased A123's common stock in reliance on the integrity of the market price of that common stock, and Defendants manipulated the price of A123's common stock through their misconduct as described herein.  Plaintiffs' (and the Class's) losses were a direct and foreseeable consequence of Defendants' concealment of, among other things, the true state of the Prismatic Battery and the manufacturing and business operations, growth prospects, and financial condition of A123 Systems.

155.    Throughout the Class Period, Defendants were aware of material non-public information concerning A123's fraudulent conduct (including the false and misleading statements described herein).  Throughout the Class Period, Defendants willfully and

knowingly concealed this adverse information, and Plaintiffs' (and the Class's) losses were the foreseeable consequence of Defendants' concealment of this information.

156.     As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their respective purchases and sales of A123 Systems common stock during the Class Period.

COUNT II

**Violation of Section 20(a) of the Exchange Act**<br>**<u>Against the Individual Defendants</u>**

157.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

158.     As alleged herein, the Individual Defendants acted as controlling persons of A123 Systems within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their executive positions, and/or Board membership, as alleged above, these individuals had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

159.     In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

160.     As set forth above, the Individual Defendants and A123 Systems committed a primary violation of Section 10(b) and Rule 10b-5 of the Exchange Act by the acts and omissions alleged in this Complaint.  By virtue of their positions as controlling persons of A123 Systems, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of A123's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action;

B.     Awarding compensatory damages in favor of Plaintiffs and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: August 31, 2012

           **BERMAN DEVALERIO**

           /s/ Kathleen M. Donovan-Maher

           Kathleen M. Donovan-Maher (BBO #558947)
           kdonovan-maher@bermandevalerio.com
           Bryan A. Wood (BBO #648414)
           bwood@bermandevalero.com
           One Liberty Square
           Boston, Massachusetts 02109
           Tel: (617) 542-8300
           Fax: (617) 542 1194

           *Lead Counsel for Plaintiffs*

           **MILBERG LLP**
           Ariana J. Tadler
           atadler@milberg.com
           Charles Slidders
           cslidders@milberg.com
           One Pennsylvania Plaza, 49th Floor
           New York, New York 10119
           Tel: (212) 594-5300
           Fax: (212) 868-1229

           *Counsel for Lead Plaintiff*

           **POMERANTZ GROSSMAN, HUFFORD,**
               **DAHLSTROM & GROSS, LLP**
           Marc I. Gross
           migross@pomlaw.com
           Jeremy A. Lieberman
           jalieberman@pomlaw.com
           Emma Gilmore
           egilmore@pomlaw.com
           100 Park Avenue, 26th Floor
           New York, New York 10017-5516
           Tel: (212) 661-1100
           Fax: (212) 661-8665

           *Counsel for Plaintiffs*

### CERTIFICATE OF SERVICE

I, Kathleen M. Donovan-Maher, certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as nonregistered participants by first class mail on August 31, 2012.

Dated:  August 31, 2012

/s/ *Kathleen M. Donovan-Maher*
Kathleen M. Donovan-Maher

DOCS\639555v1

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Suk Cheung , certify that:

1. I have reviewed the complaint in this matter in applying for Lead Plaintiff status and for all other purposes.

2. I authorize Milberg LLP to act on my behalf in this matter in applying for Lead Plaintiff status and for all other purposes.

3. I did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

4. I am willing to serve as a Lead Plaintiff either individually or as part of a group. A Lead Plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include providing testimony at deposition and trial, if necessary.

5. I have not and will not accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is unaffected by my decision to serve as a representative party, Lead Plaintiff.

7. The number of shares or other securities of I held immediately **BEFORE** the first day of the Class Period referenced in the relevant complaint (if any) was: 59 , and the type of securities was (check one):
   ☑ Common Stock  ☐ Bonds  ☐ Preferred Stock  ☐ Call  ☐ Put

8. I have listed below all my transactions in the securities of A123 Systems, Inc.(Nasdaq: AONE) **DURING** the Class Period referenced in the complaint as follows:

| Type of Security (Common stock, Preferred Stock, Calls, Puts or Bonds) | Purchase/Acquisition or Sale/Disposition | Quantity | Trade Date (mm/dd/yy) | Price per Share/Security ($) |
|---|---|---|---|---|
| | | SEE ATTACHED SCHEDULE A | | |

(* List additional transactions on separate sheet, if necessary)

These securities were acquired or held in (check all that apply):  ☑ General (non-retirement account)
☐ Merger/acquisition/distribution  ☐ Gift  ☐ IRA  ☐ Employer-sponsored plan (401k, 403b, etc.)

9. I made the following sales of securities of  A123 Systems, Inc.(Nasdaq: AONE) during the 90-day period **AFTER** the Class Period referenced in the complaint:

Sales

| Type of Security (Common stock, Preferred Stock, Calls, Puts or Bonds) | Quantity | Trade Date (mm/dd/yy) | Price per Share/Security ($) |
|---|---|---|---|
| Common | 134,070 | See attach | |

10. During the three years prior to the date of this Certification, I have not sought to serve and I have not served as a representative party for a class in an action filed under the federal securities laws, except as described below (if any):

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Executed this ___29___ day of ___MAY___, 2012

___Suk K. Cheung___
Name (Printed)

_____
Signature

### Schedule A
### Suk Cheung Transaction(s) in
### A123 Systems Inc. (NASDAQ:AONE)

**Purchase(s):**

| Date | Shares | Price |
|------|--------|-------|
| 03/01/11 | **4,000** | 8.4500 |
| 03/01/11 | **4,000** | 8.4800 |
| 03/01/11 | **4,000** | 8.4900 |
| 03/31/11 | **2,000** | 6.3100 |
| 03/31/11 | **2,000** | 6.3100 |
| 03/31/11 | **2,000** | 6.7000 |
| 03/31/11 | **4,000** | 6.7500 |
| 04/08/11 | **4,000** | 5.3500 |
| 04/08/11 | **3,600** | 5.4000 |
| 04/08/11 | **400** | 5.3999 |
| 04/08/11 | **4,000** | 5.5700 |
| 04/08/11 | **4,000** | 5.6500 |
| 04/08/11 | **4,000** | 5.6700 |
| 04/08/11 | **2,000** | 5.7100 |
| 04/08/11 | **2,000** | 5.7500 |
| 06/08/11 | **2,000** | 4.8300 |
| 06/08/11 | **2,000** | 5.0890 |
| 08/03/11 | **2,000** | 4.2000 |
| 10/04/11 | **4,000** | 2.9000 |
| 11/14/11 | **10,000** | 2.7000 |
| 11/14/11 | **10,000** | 2.8000 |
| 11/14/11 | **10,000** | 2.8200 |
| 11/15/11 | **10,000** | 2.4400 |
| 11/15/11 | **10,000** | 2.4500 |
| 11/15/11 | **10,000** | 2.5200 |
| 11/15/11 | **10,000** | 2.6100 |

**Sale(s):**

| Date | Shares | Price |
|------|--------|-------|
| 05/15/12 | **326** | 1.0000 |
| 05/15/12 | **1,200** | 0.9534 |
| 05/15/12 | **200** | 0.9535 |
| 05/15/12 | **1,200** | 0.9537 |
| 05/15/12 | **1,700** | 0.9544 |
| 05/15/12 | **2,000** | 0.9545 |
| 05/15/12 | **1,000** | 0.9555 |
| 05/15/12 | **1,000** | 0.9556 |

| | | |
|---|---|---|
| 05/15/12 | **3,993** | 0.9565 |
| 05/15/12 | **600** | 0.9571 |
| 05/15/12 | **500** | 0.9575 |
| 05/15/12 | **400** | 0.9583 |
| 05/15/12 | **600** | 0.9584 |
| 05/15/12 | **500** | 0.9591 |
| 05/15/12 | **400** | 0.9592 |
| 05/15/12 | **2,100** | 0.9599 |
| 05/15/12 | **19,193** | 0.9600 |
| 05/15/12 | **11,040** | 0.9601 |
| 05/15/12 | **4,572** | 0.9602 |
| 05/15/12 | **700** | 0.9603 |
| 05/15/12 | **1,600** | 0.9604 |
| 05/15/12 | **400** | 0.9606 |
| 05/15/12 | **1,300** | 0.9608 |
| 05/15/12 | **400** | 0.9609 |
| 05/15/12 | **100** | 0.9610 |
| 05/15/12 | **700** | 0.9649 |
| 05/15/12 | **300** | 0.9653 |
| 05/15/12 | **976** | 0.9655 |
| 05/15/12 | **2,724** | 0.9655 |
| 05/15/12 | **100** | 0.9656 |
| 05/15/12 | **2,100** | 0.9657 |
| 05/15/12 | **3,000** | 0.9659 |
| 05/15/12 | **500** | 0.9660 |
| 05/15/12 | **200** | 0.9661 |
| 05/15/12 | **100** | 0.9672 |
| 05/15/12 | **600** | 0.9691 |
| 05/15/12 | **12,291** | 0.9700 |
| 05/15/12 | **400** | 0.9701 |
| 05/15/12 | **14,089** | 0.9702 |
| 05/15/12 | **3,242** | 0.9703 |
| 05/15/12 | **500** | 0.9705 |
| 05/15/12 | **3,081** | 0.9800 |
| 05/15/12 | **337** | 0.9801 |
| 05/15/12 | **900** | 0.9900 |
| 05/15/12 | **4,400** | 0.9901 |
| 05/15/12 | **1,730** | 0.9902 |
| 05/15/12 | **100** | 0.9903 |
| 05/15/12 | **1,200** | 0.9905 |
| 05/15/12 | **500** | 0.9906 |
| 05/15/12 | **2,900** | 0.9931 |
| 05/15/12 | **2,672** | 0.9949 |
| 05/15/12 | **1,100** | 0.9900 |

| | | |
|---|---|---|
| 05/15/12 | **16,904** | 1.0100 |

# Certification of Plaintiff
# Pursuant to Federal Securities Laws

1.    I, Scott Heiss, make this declaration pursuant to Section 101 of the Private Securities Litigation Reform Act of 1995 as required by Section 21D (a) (2) of Title I of the Securities Exchange Act of 1934.

2.    I have reviewed a Complaint against A123 Systems, Inc. ("AONE"), and authorize a filing of a comparable complaint on my behalf.

3.    I did not purchase my AONE securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under Title I of the Securities Exchange Act of 1934.

4.    I am willing to serve as a representative party on behalf of a class as set forth in the Complaint, including providing testimony at deposition and trial, if necessary.    I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    To the best of my current knowledge, the attached sheet lists all of my purchases and sales in AONE securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws, except as follows:

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

8.    The matters stated in this declaration are true to the best of my current knowledge, information and belief.

I declare under penalty or perjury that the foregoing is true and correct.

**Executed** ___3-30-2012___ **, at** ___Charlotte  Nc___
            **(Date)**                              **(City, State)**

                                              **(Signature)**

                           Scott Heiss
                         **(Type or Print Name)**

A123 SYS INC                                          Heiss, Scott
CLASS PERIOD: FEB 28 2011 through MAR 23 2012
            LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 5/13/2011 | PUR | 1,475 | $6.0100 |
| 6/16/2011 | PUR | 1,640 | $5.0500 |
| 6/28/2011 | SLD | 350 | $5.1500 |
| 6/28/2011 | SLD | 1,290 | $5.1000 |
| 1/26/2012 | PUR | 8,400 | $2.1700 |
| 2/3/2012 | SLD | 9,875 | $2.2700 |
| 2/16/2012 | PUR | 2,976 | $2.1100 |
| 2/17/2012 | PUR | 7,500 | $2.1600 |
| 2/24/2012 | PUR | 3,650 | $1.9600 |
| 2/28/2012 | SLD | 14,126 | $1.8800 |
| 2/29/2012 | PUR | 14,200 | $1.8700 |

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.  I, Michael Zoilas, make this declaration pursuant to Section 21D(a)(2) of the Securities Exchange Act of 1934 as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against A123, Inc. ("A123"), and authorize the filing of a motion on my behalf for appointment as lead plaintiff.

3.  I did not purchase or acquire A123 securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Exchange Act of 1934.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired A123 during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in A123 securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed    <u>6 / 31 / 12</u>   , at    _____
                    **(Date)**                          **(City, State)**

                                                  _____
                                                   **(Signature)**

                                               <u>Michael Zo.tes</u>
                                             **(Type or Print Name)**

A123 SYS INC                                           Zoitas, Michael

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| **Frascella, Larry** | | | |
| 08/18/2011 | PUR | 10,000 | $4.0137 |
| 11/21/2011 | PUR | 20,000 | $2.2719 |
| 12/14/2011 | PUR | 20,000 | $1.9519 |
| 01/04/2012 | PUR | 15,000 | $1.9659 |
| 01/05/2012 | PUR | 10,000 | $2.2129 |
| 01/06/2012 | PUR | 25,000 | $2.1714 |
| 01/24/2012 | PUR | 25,000 | $2.2935 |
| 02/06/2012 | PUR | 25,000 | $2.6409 |
| 02/10/2012 | PUR | 25,000 | $2.0891 |
| 02/24/2012 | PUR | 25,000 | $2.0190 |
| 03/01/2012 | PUR | 25,000 | $1.9942 |
| 03/05/2012 | PUR | 25,000 | $1.6411 |
| 03/09/2012 | PUR | 25,000 | $1.7111 |
| **Kaul, John** | | | |
| 07/14/2011 | PUR | 3,200 | $5.3090 |
| 01/20/2012 | PUR | 46,800 | $2.4500 |
| **Rigopoulos, Dino** | | | |
| 04/18/2011 | PUR | 2,000 | $5.9485 |
| 07/06/2011 | PUR | 2,000 | $5.2690 |
| 08/09/2011 | PUR | 1,500 | $3.3299 |
| 10/12/2011 | PUR | 1,000 | $3.9680 |
| 11/21/2011 | PUR | 2,000 | $2.1791 |
| 11/30/2011 | PUR | 5,100 | $2.3790 |
| 12/14/2011 | PUR | 1,400 | $1.8980 |
| 01/04/2012 | PUR | 5,000 | $1.9690 |
| 01/05/2012 | PUR | 5,000 | $2.0591 |
| 02/10/2012 | PUR | 10,000 | $2.0400 |
| **Zoitas, George** | | | |
| 06/08/2011 | PUR | 3,000 | $4.9690 |
| 06/08/2011 | PUR | 3,000 | $5.2122 |
| 09/16/2011 | PUR | 5,000 | $4.7706 |
| 11/21/2011 | PUR | 12,000 | $2.2199 |
| 11/21/2011 | PUR | 12,000 | $2.4611 |
| 12/16/2011 | PUR | 20,000 | $1.6900 |
| 02/09/2012 | PUR | 34,000 | $2.1202 |
| 02/09/2012 | PUR | 35,000 | $1.8700 |
| 03/05/2012 | PUR | 1,000 | $1.6200 |