UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 12-10591-RGS

IN RE A123 SYSTEMS, INC. SECURITIES LITIGATION

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED AMENDED COMPLAINT

March 14, 2013

STEARNS, D.J.

This putative class action is brought by Suk Cheung, Scott Heiss, and Michael Zoitas on behalf of all persons and entities who purchased the common stock of A123 Systems, Inc. (A123), between February 28, 2011, and March 26, 2012. The proposed class was allegedly duped by misrepresentations disseminated by defendants in violation of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, and Rule 10b-5. Defendants are former high ranking officers of A123: David P. Vieau, Chief Executive Officer; David J. Prystash, Chief Financial Officer; and John R. Granara III, Interim Chief Financial Officer.[1] Defendants now move to dismiss the

---

[1] A123 Systems, Inc., is named separately as a defendant, but the case against it was automatically stayed when the company filed for bankruptcy protection. *See* 11 U.S.C. § 362. On January 29, 2013, A123 Systems LLC, a wholly owned subsidiary of Wanxiang America Corporation, acquired the non-government business assets of A123.

Consolidated Amended Complaint on the grounds that it fails to allege: (1) any actionable omission or misstatement; (2) scienter; or (3) loss-related causation.

BACKGROUND

The facts, in the light most favorable to plaintiffs as the non-moving parties, are as follows. A123 Systems, Inc. manufactured and sold rechargeable lithium ion batteries and battery systems. Am. Compl. ¶ 2. The bulk of A123's sales were in the transportation sector where its battery systems were designed to power electric vehicles. *Id.* ¶ 40; Def.'s Ex. B at 1.[2] A123 supplied batteries to BMW, General Motors, Daimler, and Fisker Automotive, among other manufacturers. Am. Compl. ¶ 40; Def.'s Exs. B & C at 1. The A123 "flagship product" was the AMP20 Lithium Ion Prismatic Cell (prismatic battery). Am. Compl. ¶ 38. Unlike ordinary batteries, prismatic cell batteries are flat and, as the name implies, shaped like a prism. *Id.* The prismatic cells are wired in a series, which are in turn wired in parallel and welded together. *Id.* As described by A123, the prismatic battery was "built to deliver high energy and power density combined" and "demonstrates industry-leading abuse tolerance coupled with excellent life performance under the most rigorous duty cycles." *Id.* ¶ 39.

In January of 2010, A123 entered into a multi-year contract with Fisker to supply

---

[2] The court cites defendants' exhibits referenced in the Complaint.

prismatic batteries for the Fisker Karma, a new high-performance sports car. *Id.* ¶ 42. Fisker chose A123 as the battery supplier "because of the company's ability to meet [its] performance needs and rapidly scale to [its] production volume . . . ." *Id.*; Def.'s Ex. D. In tandem with the announcement of the supply agreement, A123 invested over twenty million dollars in cash and stock in Fisker to "closely align the interests of both companies." Def.'s Ex. D. Prior to negotiating the Fisker contract, A123 suffered net losses of $80 million in 2008, $87 million in 2009, and, in 2010, an even larger loss of $153 million. Am. Compl. ¶ 45. Against this backdrop, Fisker became A123's largest customer, expected by A123 to account for nearly one quarter of its anticipated revenue in 2011. *Id.* ¶ 41. In a press release dated August 4, 2011, defendant Vieau announced that revenue in the second quarter of 2011 had doubled "due largely to the fact that [A123] started shipping prismatic modules and packs in volume to Fisker and Smith Electric Vehicles." *Id.* ¶ 88. In a conference call discussing the second quarter results, A123's management professed its belief that the partnership with Fisker was the key to A123's future growth. *Id.* ¶¶ 90, 92.

The prismatic batteries were manufactured at A123's Livonia, Michigan facility. *Id.* ¶ 83; Def.'s Ex. D. The Livonia plant, one of two new A123 facilities located in Michigan, opened on September 13, 2010. Throughout 2010 and 2011, the plant was in the process of "ramp[ing] up" its prismatic cell production capacity, in part to meet

the demands of the Fisker supply agreement.  Def's. Br. at 3; Def's Ex. C at 77.

During this period, the Livonia facility increased battery production from 1,000 to

11,000 cells per day.  Am. Compl. ¶ 54.

On November 4, 2011, A123 revised its 2011 revenue guidance downward by

twenty-two percent "due to an unexpected reduction in orders for battery packs from

Fisker for the fourth quarter as it balances inventory levels from all suppliers."  Def.'s

Ex. O.  Vieau characterized the reduction as "temporary," and stated that "[A123's]

relationship with Fisker remains strong . . . ."  *Id.*  A123's stock price dropped another

ten pecent after the revision was made public.  Am. Compl. ¶ 94.  On December 21,

2011, the National Highway Transport Safety Association announced that Fisker was

recalling all of the 239 Karma vehicles manufactured between July 1, 2011, and

November 3, 2011, because of a defect in a hose clamp in the A123 battery.  *Id.* ¶ 103.

On March 8, 2012, *Consumer Reports* issued a critical review of a prototype of

the Fisker Karma, noting that during testing the vehicle's "dashboard flashed a message

and sounded a 'bing' showing a major default," and that despite attempts at repair, the

Karma proved inoperable and had to be towed.  *Id.* ¶ 108; Def.'s Ex. H.  Further

investigation pinpointed the prismatic battery as the cause of the breakdown.  Am.

Compl. ¶ 114.  On March 26, 2012, A123 issued a press release stating that it had

"discovered that some prismatic cells made in [its] Livonia facility may contain a defect

which can result in premature failure of a battery pack or module that includes a defective cell." *Id.* The company announced that it had "launched a field campaign to replace battery modules and packs that may contain defective prismatic cells produced at A123's Livonia, Mich. manufacturing facility." *Id.* The cost of the recall was estimated at $55 million, approximately one quarter of A123's projected annual revenue for 2012. *Id.* A123's stock price dropped twelve percent on the day of this disclosure. *Id.* ¶ 117. Two days later, the stock fell another thirteen percent after Deutsche Bank downgraded A123's rating from a "buy" to a "hold." *Id.* ¶¶ 118, 119. This lawsuit was filed one week later.

## DISCUSSION

To sustain a claim for securities fraud under Section 10(b) and Rule 10b-5 a plaintiff must satisfactorily plead six elements: "(1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 756 (1st Cir. 2011). In addition to these skeletal requirements, allegations of securities fraud must also meet the heightened pleading standard set out in the Private Securities Litigation Reform Act of 1995 (PSLRA) and Federal Rule of Civil Procedure 9(b). The PSLRA standard is "congruent and consistent" with the First Circuit's "rigorous"

interpretation of the pleading requirements of Rule 9(b).  *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999).

## A. PSLRA Pleading Requirements

The PSLRA requires that a complaint alleging a material misrepresentation or omission "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  In explaining why a statement or omission is misleading, a complaint "must provide some factual support for the allegations of fraud."  *Greebel*, 194 F.3d at 193 (internal quotation marks and citation omitted).  This means that a plaintiff must offer "factual allegations that would support a reasonable inference that adverse circumstances existed at the time of the offering [of the alleged misrepresentation], and were known and deliberately or recklessly disregarded by defendants."  *Id.* at 193-194 (internal quotation marks and citation omitted).

The PSLRA further requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. §78u-4(b)(2).  This required state of mind is known as scienter, a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (internal quotation marks and citation omitted).  To make out scienter, a plaintiff must establish

that "defendants consciously intended to defraud, or that they acted with a high degree of recklessness." *New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 44 (1st Cir. 2008) (internal quotation marks and citation omitted). Scienter under the recklessness standard requires "a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." *Greebel*, 194 F.3d at 198, quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977).   Moreover, an inference of scienter will "not survive if [it is] merely reasonable." *Id.* at 195.   A "strong" inference of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

**B. Defendants' Alleged Misrepresentations**

Plaintiffs have identified a number of statements made by defendants that they allege were materially misleading.  The statements fall into three general categories: (1) those expressing confidence in the market demand for the A123 prismatic batteries; (2) those touting the superior quality and supposed safety of the A123 battery design; and (3) those crowing over A123's partnering with Fisker in the production of the Karma

electric sports car.  A fair sampling of these statements includes:

> (1) Vieau's pronouncement in the February 28, 2011 press release that A123 "continue[s] to be optimistic about the expected long-term demand for advanced battery systems, as well as A123's technology and market leadership position." Am. Compl. ¶ 81.

> (2) The assertion made in the Form 10-K filed by A123 on March 11, 2011, that the Livonia plant "is designed to enable the . . . manufacturing of high-value components," and the further representations that: "Our battery systems are highly engineered to incorporate safety and control features that extend life and improve performance.  Module-level fusing, temperature sensing and other safety controls provide against containment safeguards to isolate and protect against cell-level failure. Active overvoltage protection provides monitoring and balancing of individual series elements to protect cells from abuse and to extend life." *Id.* ¶ 83.

> (3) Vieau's statement in the November 4, 2011 press release announcing the downward revision of the 2011 revenue guidance attributing the disappointing results "to an unexpected reduction in orders for battery packs from Fisker Automotive for the fourth quarter as it balances inventory levels from all suppliers." In the same press release, Vieau also stated:  "Our relationship with Fisker remains strong, and we expect that this reduction in volume is temporary . . . ." *Id.* ¶¶ 94, 95.

> (4) Vieau's statement in an earnings call on March 8, 2012, following Fisker's recall of the Karma vehicles, that the "root cause" of the battery problems was an incorrectly positioned hose clamp that "certainly had nothing to do with the integrity of the packs themselves or the cells or the systems." *Id.* ¶ 109.

Plaintiffs contend that all of A123's statements shared the same fatal defect:

A123 "failed to disclose that the Company's Prismatic Batteries were flawed; the

process for manufacturing the Prismatic Batteries at its Livonia, Michigan facility was

flawed; the flawed process resulted in defective Prismatic Batteries; and the defective nature of the batteries had a significant and material adverse impact on the Company's revenue and expenses and jeopardized its relationship with its customers." *Id.* ¶¶ 84, 87, 91, 93, 96, 100, 104, 106, 113.  According to unnamed sources, the manufacturing process at the Livonia plant was flawed from the outset. *Id.* ¶¶ 56, 57.  Although the plant was producing substandard prismatic cells, A123 continued to increase production to meet Fisker's demands. *Id.* ¶ 57.  In the attempt to keep pace, the Livonia facility "ignored and discarded" any semblance of quality control resulting in a slew of manufacturing errors that ultimately caused the batteries to fail. *See id.* ¶¶ 50-79.

## C. Defendants' Knowledge of the Livonia Plant's Flawed Manufacturing Process

Assuming for present purposes that plaintiffs' allegations about the shoddy manufacturing process at the Livonia facility are true, the dispositive issue is whether the named defendants had knowledge of (or were recklessly blind to) the impending quality collapse.  "A statement cannot be intentionally misleading if the defendant did not have sufficient information at the relevant time to form an evaluation that there was a need to disclose certain information and to form an intent not to disclose it." *New Jersey Carpenters*, 537 F.3d at 45.  Whether analyzed in terms of an "actionable misstatement," as the parties do here, or as a component of the scienter requirement,

a viable complaint must establish that defendants were or should have been aware of the facts making their statements misleading at the time the statements were made. "Simply pleading that the defendant knew of the falsity, without providing any factual basis for that knowledge, does not suffice." *Ezra Charitable Trust v. Tyco Int'l Ltd.*, 466 F.3d 1, 12-13 (1st Cir. 2006) (citation omitted).

Plaintiffs allege that defendants must have known that the manufacturing process at the Livonia plant was flawed because the defects "were so obvious and pervasive that Defendants either had to have known about them, or, at the very least, recklessly disregarded them." Pl.'s Br. at 6. According to plaintiffs, the argument for imputed knowledge is augmented by the fact that the Fisker relationship was crucial to A123's survival as a going concern. *Id.* at 18. Plaintiffs cite a case from this district for the proposition that "[f]acts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its officers." *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19 (D. Mass. 2004) (Young, J.), citing *Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1326 (E.D. Wash. 1998).[3] *Crowell*, the only case of which I am aware that relies on the "core operations" theory to impute knowledge to defendants in a securities case, involved allegations of

---

[3] The proposition also appears as dicta in *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 235 (D. Mass. 1999) (Young, J.), but in that case the defendants did not argue that they were unaware of the facts giving rise to the alleged fraud.

the improper booking and accounting of fraudulent sales, buttressed by a "plus factor" – an email pointing to the company's vice president as the author of the scheme.  343 F. Supp. 2d at 19.  *Compare Lenartz v. Am. Superconductor Corp.*, 879 F. Supp. 2d 167, 183 n.9 (D. Mass. 2012) (Young, J.) (finding the core operations theory inapplicable in an accounting fraud case where the questionable client accounted for over seventy percent  of the company's revenue because the facts were "less clear" than the "particularized facts" of *Crowell*).

Plaintiffs suggest two avenues by which information about the flaws in the Livonia manufacturing process might have percolated upward to defendants.  The first, however, is merely hypothesized.  The anonymous witnesses state that Lou Golato, A123's Vice-President of Operations, and a member of the company's executive committee, had oversight of the Livonia plant and was "well-aware of the defects that riddled the Prismatic Batteries."  Pl.'s Br. at 11.  Because Golato "reported to the [i]ndividual defendants," Pl.'s Br. at 4, plaintiffs maintain that they must have been aware of the escalating problems with the batteries coming out of the Livonia facility.  While the anonymous sources might at best be credited with first-hand information about what Golato knew, there is no plausible suggestion that they would have known what Golato (who might have had his own reasons for covering up the problems at Livonia) may have told the defendants.  *See In re Vertex Pharm. Inc., Sec. Litig.*, 357

11

F. Supp. 2d 343, 353 (D. Mass. 2005) (plaintiffs' allegations not pled with particularity because confidential witnesses did not have personal knowledge of facts alleged); *see also Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268, 283 (D. Mass. 1998), citing *Maldonado v. Dominguez*, 137 F.3d 1, 9 (1st Cir. 1998) ("[G]eneral inferences that the defendants, by virtue of their position within the company, 'must have known' about the company's problems when they undertook allegedly fraudulent actions . . . [are] inadequate to withstand the special pleading requirements in securities fraud cases.").

The only facts plaintiffs allege suggesting that at least one of the defendants (Vieau) might have had direct knowledge of the problems at the Livonia plant relate to a meeting in early 2011 attended by Vieau in which one of the confidential witnesses "discussed issues concerning the Company's manufacturing process and made suggestions to improve those areas . . . ." Pl.'s Br. at 4. As an initial matter, this bland summary statement that an unnamed person in no specified position of authority "made suggestions" about the manufacturing process that Vieau may or may not have heard (or paid attention to) is a meager fount for even a whiff of a fraudulent scheme, much less a particularization of its details. *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 29-30 (1st Cir. 2002) (whether unattributed facts provide an adequate basis for believing that a securities defendant's statements were false requires "an evaluation, inter alia, *of the level of detail provided by the confidential sources*") (emphasis added)); *cf. New*

*Jersey Carpenters*, 537 F.3d at 51 (confidential witnesses must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"). This is especially so here, where plaintiffs trot out only one instance attributed to an unnamed witness supporting the proposition that one of the defendants must have known of incipient problems at the Livonia facility that would not be fully manifest until well over a year later when the plant's production lines began to churn. *See In re Pharm., Inc. Sec. Litig.*, 2007 WL 951695, at *19 n.14 (D. Mass. Mar. 28, 2007) (allegation that a confidential witness informed management that a pricing structure was flawed did not adequately plead scienter because "more than that would be needed to support an allegation that management itself knew the structure to be flawed, as opposed to knowing simply that someone else (of unclear qualifications) thought that to be the case").

In sum, plaintiffs have failed to meet their burden of pleading fraud against the individual defendants with the particularity demanded by the PSLRA and Fed. R. Civ. P. 9(b).  Consequently, the Section 10(b) claim will be dismissed.

**D. Control Person Liability under Section 20(a)**

To establish a Section 20(a) claim, a plaintiff must plead: (1) an underlying violation by a controlled person or entity; and (2) that a defendant controlled the

violator. *Aldridge v. A. T. Cross Corp.*, 284 F.3d 72, 85 (1st Cir. 2002).  Because plaintiffs have failed to adequately allege a violation of Section 10(b), their derivative claim under Section 20(a) necessarily fails.  *See Suna v. Bailey Corp.*, 107 F.3d 64, 72 (1st Cir. 2002).

### E. Leave to Amend Complaint

In the event of dismissal, plaintiffs request leave to further amend the Consolidated Amended Complaint.  "Leave to amend is to be 'freely given,' Fed. R. Civ. P. 15(a), unless it would be futile, or reward, *inter alia*, undue or intended delay." *Resolution Trust Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir. 1994) (citations omitted). While futility is a close question given the paucity of detail supporting any allegation of fraud that plaintiffs have managed thus far to assemble (as evidenced by the meager allegations in the current Complaint), Rule 15 counsels permitting a third bite at the apple at this early stage of the litigation.  Consequently, the motion for leave to file an amended complaint will be granted.

ORDER

For the foregoing reasons, defendants' motion to dismiss the Consolidated Amended Complaint is <u>ALLOWED</u>.  Plaintiffs' motion to file a Second Amended Complaint is <u>GRANTED</u>.  The Second Amended Complaint will be filed on or before April 4, 2013.

14

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE